**INTER–CONTINENTAL ENGINE SERVICE, INC.**

v.

**The UNITED STATES.**

No. 8–70.

United States Court of Claims.

July 14, 1972.

R. Glenn Jarvis, McAllen, Tex., atty. of record, for plaintiff.

Thomas W. Petersen, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA and KUNZIG, Judges.

OPINION

PER CURIAM:

This case was referred to Trial Commissioner Mastin G. White with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on October 21, 1971. Plaintiff filed exceptions to the commissioner's opinion, findings of fact and recommended conclusion of law and defendant urged the court to adopt them as the basis for its judgment in the case. Plaintiff's motion to submit the case to the court without oral argument has been allowed and the case has been submitted to the court on the briefs of the parties without oral argument of counsel.

Since the court agrees with the commissioner's opinion, findings of fact and recommended conclusion of law, with minor corrections in the findings, it hereby adopts the same as the basis for its judgment in this case as hereinafter set forth. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

OPINION OF COMMISSIONER

WHITE, Commissioner:

The plaintiff contends in this case that the Immigration and Naturalization Service ("the Service") of the U.S. Department of Justice breached a negotiated contract which the Service and the plaintiff entered into on May 29, 1968, for the fiscal year 1969. According to the petition, the Service breached the contract "by utilizing * * * other private concerns to perform routine and daily pre-flight inspections" on Service-operated aircraft, instead of calling on the plaintiff to perform such inspections under the contract previously mentioned. The petition alleges that the inspections in question were improperly procured by the Service during the period September 1968–June 1969, that they numbered at least 126, and that they were procured by the Service principally from a firm located in El Centro, California.

It is my opinion that the contract in question was not breached by the Service, and, accordingly, that the plaintiff

is not entitled to recover in the present action.

A routine daily and preflight inspection is a service which a passenger-carrying aircraft is required by the Federal Aviation Regulations to receive from qualified personnel within the 24-hour period immediately preceding any take-off on a flight. The purpose is to determine the airworthiness of the aircraft. In the conduct of such an inspection, there are, on most occasions, repairs or other services to the aircraft which are related to, or accomplished as incidents to, the inspection by the personnel conducting the inspection, and for which an additional charge is made if the inspection and related work are performed by an independent private concern.

The plaintiff is a Texas corporation. Its business is the inspection, repair, overhaul, modification, refurbishing, and servicing of aircraft that weigh 12,500 pounds or more. The plaintiff operates a facility at Brownsville, Texas, and another facility at El Paso, Texas. Both of these facilities are FAA certified repair stations. The 1969 contract that is involved in the present litigation covered the performance by the plaintiff's El Paso station of work on aircraft operated by the Service.

At the time when the contract for 1969 was entered into, and throughout the fiscal year 1969, the Southwest Region of the Service had three passenger-carrying aircraft based at El Paso, Texas—a DC-6A with a 97-passenger capacity, a Convair 340–440 with a 50-passenger capacity, and another Convair 340–440 with a 44-passenger capacity.

When the contract for 1969 was negotiated, and continuing through the first half of the fiscal year 1969, the aircraft mentioned in the preceding paragraph were operating regularly out of El Paso, Texas, and were being used by the Service principally in an air-lift of illegal Mexican immigrants from San Diego, California, and El Centro, California, to El Paso. Many Mexican immigrants had illegally crossed into Arizona and Southern California to work on farms in those areas, and substantial numbers of them had then gone into Northern California, Oregon, and Washington in search of further employment. When illegal Mexican immigrants were apprehended in Arizona, California, or the Pacific Northwest, they were generally assembled in San Diego, California, or El Centro, California, and from those places they were transported in Service-operated aircraft to El Paso, Texas. From El Paso, the illegal Mexican immigrants were returned to Mexico through Juarez, and then were transported into the interior of Mexico by means of a Mexican-operated air-lift, train-lift, or bus-lift.

The air-lift from San Diego, California, and El Centro, California, to El Paso, Texas, as described in the preceding paragraph of this opinion, turned out to be financially very burdensome to the Service, in the light of the funds available to it for the fiscal year 1969. As a means of saving expenses, the Service discontinued this air-lift at about the beginning of September 1968 and substituted for it a bus-lift, which involved the transportation of illegal Mexican immigrants in Service-operated buses from points in Arizona, California, and the Pacific Northwest to Andrade, California, where the illegal Mexican immigrants were transferred to Mexican-operated buses for transportation into the interior of Mexico. This bus-lift was continued throughout the remainder of the fiscal year 1969 (and up until the time of the trial in June of 1971).

As a result of the discontinuance of the air-lift from San Diego and El Centro to El Paso, there was no longer any great need during the remainder of the fiscal year 1969 for the Service's aircraft on passenger-carrying flights to or from El Paso, and such aircraft and their crews were idle much of the time. This adversely affected the amount of work that the plaintiff would otherwise have been called upon to perform at El

Paso on the Service's aircraft under the contract for the fiscal year 1969.

The number of illegal Mexican immigrants apprehended in Northern California and the Pacific Northwest proved to be too great for the Service-operated bus-lift to be able to handle their transportation to the Mexican border with reasonable expedition. As a consequence, the Service adopted a plan in September of 1968 whereby, for the remainder of the fiscal year 1969, the Service's two Convair 340–440's and their crews were, with substantial regularity, detailed on a rotating basis from El Paso, Texas, to El Centro, California, for the purpose of supplementing the Service's bus-lift.

Under the plan of rotation, a Convair 340–440 and its crew would leave El Paso, Texas, on a Monday morning and would proceed to El Centro, California, on a detail lasting through Friday of the particular week. The aircraft would operate during the 5-day detail out of the El Centro Naval Air Station and would be used in the transportation of illegal Mexican immigrants from points in Northern California and the Pacific Northwest to El Centro, from which place the illegal immigrants were transported in Service-operated buses to Andrade, California, for transfer to Mexican-operated buses so that they could be transported into the interior of Mexico. The members of the aircraft crew were in a travel status, and received a per diem allowance in lieu of subsistence, during the 5-day detail. At the end of the 5-day detail, the crew would fly the aircraft back to El Paso. Then, on the following Monday, the other Convair 340–440 and its crew would generally be detailed from El Paso to El Centro for a 5-day period.

On a few occasions, when its greater carrying capacity was needed for the transportation of illegal Mexican immigrants from Northern California or the Pacific Northwest to El Centro, the Service's DC–6A and its crew were temporarily detailed from El Paso to El Centro.

During the 5-day details of the Service's aircraft from El Paso, Texas, to El Centro, California, as outlined in the two immediately preceding paragraphs, it was necessary for such aircraft to receive routine daily and preflight inspections, since a passenger-carrying aircraft must receive such an inspection from qualified personnel within the 24-hour period immediately preceding any take-off on a flight. Such inspections were procured by the Service in El Centro from Ken Bemis Aircraft Service, a private concern with which the plaintiff had no connection. On each occasion, the routine daily and preflight inspection was procured on an *ad hoc* basis by the pilot in command of the affected aircraft, utilizing for this purpose delegated authority to procure needed goods and services costing $500 or less, without entering into a formal contract.

The Service procured 129 routine daily and preflight inspections from Ken Bemis Aircraft Service during the period September 1968–June 1969. The Service paid Ken Bemis Aircraft Service a total of $14,461.46 for services performed during the fiscal year 1969, and most of this money was paid for the routine daily and preflight inspections previously mentioned.

As the plaintiff, under the 1969 contract with the Service, had the responsibility of maintaining the log books for the Service's aircraft, the plaintiff became aware when the Service's aircraft returned to El Paso, Texas, from El Centro, California, for weekends that Ken Bemis Aircraft Service had performed routine daily and prelight inspections on such aircraft. Beginning in October 1968, the plaintiff complained to the Service on several occasions that the actions of the Service in procuring routine daily and preflight inspections on the Service's aircraft from Ken Bemis Aircraft Service amounted to violations of the 1969 contract. It was the plaintiff's position that the 1969 contract required the Service to return its aircraft to the plaintiff's El Paso station for each re-

quired routine daily and preflight inspection, irrespective of where a particular aircraft might be operating at any given time. On the other hand, representatives of the Service took the position consistently that the procuring of routine daily and preflight inspections from Ken Bemis Aircraft Service during the 5-day periods when the Service's aircraft were detailed to El Centro, California, did not breach the 1969 contract.

The controversy between the parties could not be resolved administratively, and the plaintiff instituted the present court action for alleged breach of contract.

The contract between the Service and the plaintiff for the fiscal year 1969 covered the "repair, maintenance * * *, servicing and inspection of Government-owned aircraft and components at El Paso, Texas, in strict accordance with the terms, conditions and specifications of this * * * [contract], during the period July 1, 1968 through June 30, 1969." It prescribed a schedule of hourly rates that were to be paid by the Service to the plaintiff for various types of work which the plaintiff was to perform under the contract, and provided that parts were to be furnished to the Service by the plaintiff at the latter's acquisition cost. Both parties to the present litigation are in agreement that the performance of routine daily and preflight inspections was within the scope of the 1969 contract.

The plaintiff argues that, during the 5-day details of the Service's aircraft to El Centro, California, the Service was required by the 1969 contract to return its aircraft to the plaintiff's El Paso station for each required routine daily and preflight inspection, instead of procuring such daily inspections in El Centro from Ken Bemis Aircraft Service, because one of the special conditions of the contract stated in part as follows:

* * * It is understood and agreed that the Government will order from the contractor all of such services and/or supplies called for in this

contract, as there may be need for, during the contract period. * * *

The contractual provision quoted in the preceding paragraph plainly obligated the Service to procure from the plaintiff's El Paso station "all * * * services * * * called for in this contract, as there may be need for"; but the "services * * * called for in this contract" were the "repair, maintenance * * *, servicing and inspection of Government-owned aircraft and components *at El Paso, Texas*" [emphasis supplied]. In this connection, the evidence in the record shows that the Service did procure from the plaintiff's El Paso station not only all the routine daily and preflight inspections, but also all other work, needed by the Service's aircraft "at El Paso, Texas," during the fiscal year 1969.

Actually, the plaintiff has not been consistent in its construction of the provision in the 1969 contract which required the Service to procure from the plaintiff's El Paso station "all * * * services * * * called for in this contract, as there may be need for." During the fiscal year 1969, the Service's aircraft happened to be in Brownsville, Texas, on five separate occasions when they required routine daily and preflight inspections. On each occasion, the routime daily and preflight inspection was procured by the Service from the plaintiff's Brownsville station. Neither the plaintiff nor the Service regarded such work as being covered by the provisions of the 1969 contract. Instead, the inspection service needed in Brownsville was procured each time on an *ad hoc* basis by the pilot in command of the particular aircraft, utilizing for this purpose delegated authority to procure needed goods and services costing $500 or less, without entering into a formal contract.

Also, if the plaintiff were correct in its present contention that the 1969 contract required the Service to return its aircraft to the plaintiff's El Paso station for all routine daily and preflight inspections needed by the Service's air-

craft, the 1969 contract would similarly have required the Service to return its aircraft to the plaintiff's El Paso station for all other "repair, maintenance * * *, servicing and inspection" work needed by such aircraft. In this connection, the evidence in the record shows that during the fiscal year 1969 the Service procured for its aircraft, on an *ad hoc* basis, numerous repair, maintenance, and servicing items at such places as San Diego, Bakersfield, Stockton, Tucson, Chicago, St. Louis, Houston, San Antonio, Dallas, and Lubbock; that the plaintiff was aware at the time that such work was being performed on the Service's aircraft; and that the plaintiff did not object on the ground—and does not now contend—that such procurements by the Service at places other than El Paso from persons other than the plaintiff violated the 1969 contract.

For the reasons previously stated, it is my opinion that the Service did not violate the 1969 contract when it procured from Ken Bemis Aircraft Service at El Centro, California, the routine daily and preflight inspections which the Service's aircraft required during the 5-day details to El Centro. It necessarily follows that the plaintiff's petition should be dismissed.